FRANK N. MORSE, Apellant, v. TIMES-REPUBLICAN PRINTING COMPANY, Appellee.

**Libel per se.**  A printed false statement concerning another which
1   tends to degrade or injure him in his business or social standing, to make him odious, or subject him to public contempt or ridicule, is libelous *per se*.  The language of the article in question is considered and held susceptible of a libelous interpretation.

**Libelous matter:** WHEN A QUESTION OF FACT.  Where the matter
2   charged as libelous is open to two constructions, one of which is libelous and the other is not, the jury is to determine its character.

**Libel.**  It is not necessary that crime be imputed to constitute
3   libel.

**Republication of a libel.**  It is not a defense to an action for libel
4   that the defamatory matter was copied from another newspaper with proper credit, even though with "palliative" comments, which do not amount to a denial of the quoted statements, but such fact, under some circumstances, may be pleaded in mitigation.

Good faith. Good faith will not justify the publication of matter which is libelous *per se,* but may be pleaded in mitigation.

Malice. Legal malice is inferred from the mere publication of matter which is libelous *per se,* and no further proof of malice than the publication itself need be offered.

Justification: PLEADINGS. Where a defense is based upon the truth of the alleged libelous publication, the justification must be as broad as the libel, and must allege the truth of the statements in the sense imputed to them by the plaintiff.

Privileged publications: MALICE. The effect of the privilege extended, under certain circumstances, to the publication of ordinarily libelous matter, is simply to remove the presumption of malice and make it incumbent on the party complaining to prove malice; but this may be done by a construction of the alleged libel, or from extrinsic facts from which it may be inferred.

Privileged publications: The publication in a newspaper of defamatory matter, affecting the character or reputation of one whose only relation to the public is that of a private citizen, in the pursuit of a lawful private business, is not privileged.

Damages. Where a publication is libelous *per se,* damage is presumed and need not be specially shown.

Same. In proof of damage from the publication of libelous matter, the plaintiff may show his income prior and subsequent to the publication.

*Appeal from Marshall District Court.—* HON. OBED CASWELL, Judge.

FRIDAY, SEPTEMBER 23, 1904.

ACTION at law to recover damages on account of the publication of an alleged libel. At the close of the evidence the court directed a verdict in favor of the defendant. The plaintiff appeals.—*Reversed.*

*Boardman, Aldrich & Lawrence,* for appellant.

*Binford & Snelling* and *J. L. Carney,* for appellee.

WEAVER, J.— The defendant corporation is the publisher of a daily newspaper at Marshalltown, Iowa, and at the

time of the matters complained of the plaintiff was engaged
in business as soliciting agent for a life insurance company in
Central Iowa, where said newspaper had a large circulation.
The alleged libel for which damages are claimed was pub-
lished in said paper on or about May 27, 1901, and is
in the following words:

Exhibit A.

Morse Flew High.

A Marshalltown Insurance Agent Brings Himself Into
Prominence.

Another young man by the name of Morse is bringing
to Marshalltown unsavory advertising. The appended arti-
cle has reference to Frank N. Morse, a young man who came
to the city about three years ago to accept a position with the
Letts-Fletcher Company, but who, after losing his position,
drifted into the life insurance business. His former friends
and acquaintances in this city, where he posed as a ladies'
man, and lived far beyond his means, would recognize him
from the article from the Boone Republican, even were it not
known that the circumstances related pertained to Morse's
actions. The Republican says: "Not long ago, the exact
date of which has been forgotten, a Cholly-boy blew into
town and took everything by storm. He was it with a big I.
Swell parties were given in his honor, and he was carried
around on a little narrow shingle all painted up in auburn
hue. The young ladies bought him candy and gum and ex-
changed rings with Cholly, for he was just too cute for any-
thing. The sweet little dear! He was the guest of honor
of all the swell doin's, Cholly was. The evenings were too
far apart and parties could not be planned often enough, so
afternoon teas were given him. They were just the thing
for Cholly, doncher know? Mercy, me, how he liked them!
He had scarcely time to pick his beautiful teeth between
meals, and just let 'em go. That was ill bred in Cholly, to
go to parties with cigar-stained teeth, but the ladies didn't
care; he would have been just as sweet without teeth.

"Charles came to Boone from Marshalltown, where all
bad men who come to Boone are said to live. Charles was
not in Boone for his health. Charles was in Boone for the
other fellow's health, Charles was. The other fellow's health
is all that Charles left in Boone. He took everything else

the other had.    Charles was in the insurance business when
he came to Boone.    Since he has quit the town no one knows
exactly what business Charles is in.    The insurance company
which Charles claimed employed him would like to know; so
would a number of Boone parties who took out a policy in
Charley's company.

    "The tea party season is over.    There hasn't been a
party for a week or ten days.   Charles is gone, and the
parties but remind us of the happy days gone by when Cholly
was the guest and when Cholly let the girls chew his fresh
cud of tutti frutti.    Boone misses him very much.    So does
the company selling insurance.    Cholly was strictly onto his
job just the same; he got away with over $500 in good hard
currency, and a number of business men have recently re-
ceived inquiries as to the whereabouts of the agent who was
making our city his temporary headquarters."

    So much for the Boone view of the young man.    Morse
has been representing the Pennsylvania Mutual Life, of
which Mr. C. H. Rumsey of Des Moines is State agent.    Mr.
Rumsey was in the city a day or two ago investigating his
agent's accounts.    He says he straightened matters with the
Boone patrons of the company, but finds nothing here that
needs his attention, although Morse owes many bills, some
of which are quite large.    Mr. Rumsey says Morse has not
earned his salary and he will therefore dicharge him, after
presenting him with a ticket to St. Louis, his home.    He
says Morse has not been guilty of any great wrongdoing, but
has been indiscreet to live beyond his means.    Among his
Marshalltown creditors is the Pilgrim Hotel, which has a
claim of $80 for board, but has enough of Morse's personal
belongings, including some furniture, to square the account.
One of the banks and several of the personal friends of
Morse are creditors for various sums.

    The petition contains the usual formal allegations claim-
ing that the publication was made of and concerning plain-
tiff; that it was false and malicious, having a tendency to
bring him into public disgrace, ridicule, and contempt, and
to cause it to be believed by the public that he had been
guilty of the crime of embezzlement; and did in fact work
great injury to his business, and cause his discharge from
the service of the insurance company by which he was em-

ployed; and upon this showing asks to recover both general and special damages. The defendant admits the publication, but denies generally and specifically the charges of malice and the alleged libelous character of the publication. For a second defense it pleads that as the publisher of a newspaper it had the right to publish the matter complained of as an item of news, with fair and reasonable comment for the information of the readers of the newspaper; that such in fact was the character of the language used, and the publication was therefore privileged. For a third defense it is averred that so much of said alleged libelous article as is quoted from the Boone Republican was in fact copied from that paper, and that the remainder of the publication was simply comments of an "explanatory and palliative character," intended to "modify and explain away and clear up" the strictures contained in the language quoted from the Republican. The same count alleges the truth of certain specific statements in the article, not, however, including the statement that plaintiff had "got away with $500." A fourth count is also pleaded as matter in mitigation, alleging that the publication was made in good faith, without malice, and only after exercising reasonable care to verify the same.

The issues were tried to a jury, and at the close of the testimony the court sustained the defendant's motion for a directed verdict based on the following grounds: "First. Because the article published is not a libel, and is not actionable *per se,* and there is no evidence tending to prove that such article was published with malice. Second. Because said article is not actionable *per se,* and there is no evidence tending to prove that any special damages resulted to plaintiff from the publication of said article. Third. Because said article is privileged, or conditionally privileged, and the evidence, uncontradicted, proves that the same was published without malice, and there is no evidence tending to prove that any special damages resulted from said publication. Fourth. Because the evidence fails to show that the plain-

tiff was discharged by reason of the publication of said article, and because the evidence shows that the plaintiff was discharged for other reasons than the publication of said article. Fifth. The article published is not a malicious defamation of the plaintiff; nor did it tend, or ought it to tend, to provoke him to wrath, and expose him to public hatred, contempt, and ridicule; nor does it fall within the definition of libelous matter as defined by section 5086 of the Code. Sixth. The article in question is shown to have been published by the defendant with an honest purpose to set forth the facts, and it is the undisputed evidence that it did set forth the facts in regard to the plaintiff. Seventh. The occupation of the plaintiff was that of a public character, engaged in soliciting life insurance, and the defendant had the right to republish the Boone article, and to make statements and comments upon it, such as were justified by the facts, for the information of the public at large and its readers. Eighth. The occasion in question of the publication of this so-called libel was that of conditional privilege. The presumption arises that the publication was *bonâ fide,* and without malice, and it is incumbent upon the plaintiff to overcome this presumption, and such presumption has not been overcome by any evidence in this case."

The motion having been sustained generally, the record affords us no information as to what specific propositions the trial court intended to affirm by its ruling, and we are therefore required to consider all the several grounds assigned. To avoid undue extension of this opinion, we shall endeavor to group the several objections in a few paragraphs.

I. The motion assumes that the publication complained of is not libelous *per se,* and such is now the contention of the appellee in argument. Libel, as defined by our
1. Libel per se. statute, is the " malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath or expose him to public hatred, contempt or ridicule or

to deprive him of the benefits of public confidence or social intercourse." Code, section 5086. This definition, though found in the Criminal Code, has been held applicable in civil actions. *Stewart v. Pierce,* 93 Iowa, 136. It is also the holding of the authorities generally as a matter of common law that the publication of any printed false statement with reference to another person, which has a tendency to degrade or injure him, to render him odious, or bring him into public hatred or contempt or ridicule, or to injure him in his business or trade, or lead to his exclusion from social privileges, is libelous. *Dexter v. Spear,* 4 Mason, 116, Fed. Cas. No. 3,867; *White v. Nichols,* 3 How. 291 (11 L. Ed. 591); *Kemble v. Sass,* 12 Mo. 499; *Price v. Conway,* 134 Pa. 340 (19 Atl. Rep. 687, 8 L. R. A. 193, 19 Am. St. Rep. 704); *Stewart v. Swift Co.,* 76 Ga. 280 (2 Am. St. Rep. 40); *Morey v. Journal,* 123 N. Y. 207 (25 N. E. Rep. 161, 9 L. R. A. 621, 20 Am. St. Rep. 730); Starkie's Slander and Libel (2d Eng. Ed.) 166-168; Townshend's Slander and Libel, section 21; Cooley on Torts, 206; *Williams v. Fuller,* (Neb.) 94 N. W. Rep. 118; *White v. Nichols,* 3 How. U. S. Rep. 266 (11 L. Ed. 591); *McDonald v. Woodruff,* 2 Dill. 246, Fed. Cas. No. 8,770; *Huse v. Interocean,* 12 Ill. App. 627; *Cook v. Ward,* 6 Bing. 409; *MacLean v. Scripps,* 52 Mich. 214 (17 N. W. Rep. 815, 18 N. W. Rep. 209).

Assuming this definition to be authoritative, we come to the question whether the publication here complained of appears upon its face to be libelous? That is, waiving for the time being the claim of privilege, is the language such as naturally tends to bring the person to whom it is applied into public contempt or hatred or ridicule, or to provoke him to wrath, or to cast upon him the suspicion or stigma of dishonesty or criminality, or to injure him in his business, or to deprive him of the benefits of public confidence or social intercourse? In our judgment, the answer of the candid reader must be that the publication comes within this approved definition of libel in several particulars. That

part of it which is quoted from the Boone Republican is fairly susceptible of construction as a charge of both dishonesty and crime. It says of the plaintiff, who is there called "Charles": "Charles was not in Boone for his health. Charles was in Boone for the other fellow's health. The other fellow's health is all that Charles left in Boone. He took everything else the other had. Charles was in the insurance business when he came to Boone. Since he quit no one knows exactly what business Charles is in. The insurance company which Charles claims employed him would like to know, so would a number of Boone parties who took out a policy in Charley's company. * * * Boone misses him very much. So does the company selling insurance. Cholly was strictly onto his job just the same. He got away with over $500 good hard currency, and a number of business men have recently received inquiries as to the whereabouts of the agent who was making our city his temporary headquarters." Had the writer of this sketch said that plaintiff was a smooth swindler or confidence man, who came to Boone, and, after fleecing the people of that city by his sharp practices, had absconded, taking with him $500 belonging to his employer, who was anxious to discover his hiding place, no one would hesitate to admit that the article was libelous. Yet what person having any familiarity with the facetious and fantastic euphemisms of reportorial English would fail to put just that interpretation upon the words we have above quoted?

It is true the charge is not made in direct and unequivocal terms, and that with the exercise of some ingenuity each 2. LIBELOUS phrase in the printed article may be given a MATTER: when a question harmless signification; but this seems at most of fact. to demonstrate that the language complained of is open to two constructions, one of which is libelous and the other is not. In such case it is not within the province of the court to say, as a matter of law, which interpretation shall prevail. Alleged libelous words are

not to be taken in their most favorable or innocent signifi-
cation, but in accordance with their general acceptance, or as
they would naturally be understood by persons hearing or
reading them. *Ogden v. Riley,* 14 N. J. Law, 186 (25 Am.
Dec. 513); *Hugley v. Hugley,* 2 Bailey, 592; 2 Current
Law, page 706, note. If the words be ambiguous, the jury
are to determine, not what the defendant intended
to charge, but what in fact he did charge, and what
the reading public might reasonably suppose or understand.
*Press v. McDonald,* 63 Fed. 239 (11 C. C. A. 155, 26 L.
R. A. 531); *Post Pub. Co. v. Hallam,* 8 C. C. A. 201
(59 Fed. Rep. 530); *Iron Age Pub. Co. v. Crudup,* 85 Ala.
519 (5 South. Rep. 332); *Dorland v. Patterson,* 23 Wend.
422; *Arrow v. Bennett,* 73 Hun, 81 (25 N. Y. Supp. 1029);
*Bradley v. Cramer,* 59 Wis. 309 (18 N. W. Rep. 268, 48
Am. Rep. 511); *Mallory v. P. P. Co.,* 34 Minn. 521 (26
N. W. Rep. 904); *Garrett v. Dickerson,* 19 Md. 418; *Ster-
nau v. Marx,* 58 Ala. 608; *Hays v. Mitchell,* 7 Blackf. 117;
*Riddell v. Thayer,* 127 Mass. 487; *Turton v. Recorder,* 144
N. Y. 144 (38 N. E. Rep. 1009); *Harrison v. Findley,*
23 Ind. 265 (85 Am. Dec. 456); *Bihler v. Gockley,* 18 Ill.
App. 496; *Bettner v. Holt,* 70 Cal. 270 (11 Pac. Rep. 713);
*Bailey v. Kalamazoo Pub. Co.,* 40 Mich. 256; *Sanderson
v. Caldwell,* 45 N. Y. 400 (6 Am. Rep. 105); *Patch v.
Tribune,* 38 Hun, 368; *Purdy v. Rochester P. Co.,* 96 N.
Y. 372 (48 Am. Rep. 632). The words being fairly capable
of the defamatory meaning in which plaintiff alleges they
were used, they are actionable *per se.* It is, of course, open
to the defendant to go to the jury upon the theory that the
words, if ambiguous, were not used in a defamatory or li-
belous sense, and that, under the circumstances attending
the publication, its readers could not reasonably have so
understood them, but the issue thus raised is one of fact, and
not of law.

But it is not necessary that crime be imputed to the
plaintiff to constitute libel. It is enough if the printed arti-

cle be such that its publication naturally tends to brand him

**3. Libel.**

with dishonesty or other conduct or characteristic, deserving the contempt and reprobation of right-minded people. *Smith v. Smith,* 73 Mich. 445 (41 N. W. Rep. 499, 3 L. R. A. 52, 16 Am. St. Rep. 594); *Holston v. Boyle,* 46 Minn. 432 (49 N. W. Rep. 203); *Manget v. O'Neil,* 51 Mo. App. 35; *Thomas v. Croswell,* 7 Johns. 264 (5 Am. Dec. 269); *Over v. Hildebrand,* 92 Ind. 19; *Call v. Larabee,* 60 Iowa, 212; *Donaghue v. Gaffy,* 54 Conn. 268 (7 Atl. Rep. 552); *Cerveny v. Chicago Daily News Co.,* 139 Ill. 345 (28 N. E. Rep. 692, 13 L. R. A. 864). So, also, it is no less a libel to publish of another, without lawful excuse, imputations or statements tending to expose him to public ridicule, or to humiliate and degrade him in the eyes of the people. *Hatt v. News,* 94 Mich. 114 (53 N. W. Rep. 952); *Halley v. Gregg,* 74 Iowa, 565; *Moley v. Barager,* 77 Wis. 43 (45 N. W. Rep. 1082); *Allen v. News,* 81 Wis. 120 (50 N. W. Rep. 1093); *Buckstaff v. Viall,* 84 Wis. 129 (54 N. W. Rep. 111); *Holston v. Boyle,* 46 Minn. 432 (49 N. W. Rep. 203); *Peterson v. Tel. Co.,* 65 Minn. 18 (67 N. W. Rep. 646, 33 L. R. A. 302); *Torrance v. Hurst,* Walk. 403; *Steele v. Southwick,* 9 Johns. 214; *Morey v. Journal,* 123 N. Y. 207 (25 N. E. Rep. 161; 9 L. R. A. 621, 20 Am. St. Rep. 730), and authorities there cited. That the article from the Boone Republican was designed and well calculated to exhibit the plaintiff as a shallow, ridiculous, and contemptible person, dishonest, and undeserving of confidence, is too apparent to admit of any question. Such a represention is libelous *per se* in law no less than is a written charge involving crime or moral turpitude.

II. Counsel seem to argue that defendant did no more than to copy the offensive publication from the Boone Re-

**4. Republication of a libel.**

publican with some comment of a "palliative character," and that this is not sufficient to sustain a charge of libel, and the trial court was therefore justi-

fied in directing a verdict.    The argument is not sound.    It
is well established that it is no defense in this class of cases to
show that the defamatory publication was first made by an-
other person or newspaper, and was simply copied, with
proper credit.    Such fact, under some circumstances, may be
considered in mitigation of damages, if pleaded for that pur-
pose, but is never a bar to the plaintiff's action.    *McDonald
v. Woodruff,* 2 Dill. 244 (Fed. Cas. No. 8,770) ; *Atkinson v.
Free Press,* 46 Mich. 341 (9 N. W. Rep. 501) ; *Clarkson v.
McCarty,* 5 Blackf. 574; *Hotchkiss v. Oliphant,* 2 Hill, 510 ;
*Sans v. Joerris,* 14 Wis. 663; *Davis v. Sladden,* 17 Ore. 259
(21 Pac. Rep. 140) ; *Johnston v. Lance,* 229 N. C. 448; *De
Crespigny v. Wellesley,* 5 Bing. 392.

Nor is the rule in any manner changed, or its effect
avoided, by the fact that the party who republishes the libel
adds thereto "palliative" comments; and this is es-
pecially true where, as in this case, the palliation
is effected after the manner of the surgeon who applies
brine to the flayed surface of the human body for the re-
lief of physical suffering.    The comment is not a denial
of the quoted statements, but, on the contrary, their truth
seems to be affirmed in the opening sentence, which declares
that plaintiff is bringing "unsavory advertising" to Mar-
shalltown, a declaration which is followed by a recitation
of alleged circumstances in the plaintiff's career in that city
which could scarcely have any other effect than to increase
and emphasize the probability of the essential truth of the
original publication.    It has often been held that the very
act of copying and republishing a defamatory writing is,
in effect, an indorsement of its truth.    The act of republi-
cation is said to be an "adoption of the original calumny,"
and must be defended in the same way as if the defendant
were himself the author.    An incidental expression of dis-
belief in the truth of the libel, not amounting to a full and
complete denial thereof, is no defense.    *Hotchkiss v. Oli-
phant, supra.*    Every repetition or republication of a libel

is a new libel, and each publisher is answerable for his act to the same extent as if the calumny originated with him.

Appellee lays much stress upon its claim that it acted in good faith, exercising care to ascertain the truth before making the publication, uninfluenced by malice or ill will. But it is the law beyond all controversy that both malice and injury are implied in the publication of words which are libelous *per se.* All the plaintiff is required to prove is the publication itself and his own identity as the person thus assailed. This being done, the falsity of the defamatory matter, malice in its publication, and injury to the plaintiff are all presumed, and the publisher can escape liability therefor only by plea and proof of the truth of the libel. His good faith, when so, pleaded, is available in mitigation of damages, but not as a defense. *Bronson v. Bruce,* 59 Mich. 467 (26 N. W. Rep. 671, 60 Am. Rep. 307); *Evening Times v. Tryon,* 42 Mich. 549 (4 N. W. Rep. 267, 36 Am. Rep. 450); *Whittemore v. Weiss,* 33 Mich. 353; *Hewitt v. P. P. Co.,* 23 Minn. 178 (23 Am. Rep. 680); *Moore v. Francis,* 121 N. Y. 199 (23 N. E. Rep. 1127, 8 L. R. A. 214, 18 Am. St. Rep. 810); *Fountain v. West,* 23 Iowa, 9; *Wilson v. Fitch,* 41 Cal. 382; *King v. Root,* 4 Wend. 113 (21 Am. Dec. 102). The justice of the rule is evident. If A, in the honest belief that he is the owner of property which in fact belongs to B, interferes with it, or injures or destroys or converts it to his own use, his perfect honesty and good faith in the matter make him none the less a trespasser, and avail him nothing as a defense to B's action for compensation, though they may be material matters for the consideration of the jury in passing upon the allowance of punitive damages. The right of a man to be thus protected in his property interests, even against those who trespass upon them in good faith, is no less sacred than his right to be protected in reputation and social and business standing against a damaging libel, even though the wrongful charge be made with the utmost good

*5. GOOD FAITH.*

faith.  In *Holmes v. Jones,* 147 N. Y. 59 (41 N. E. Rep.
409, 49 Am. St. Rep. 646), Andrews, C. J., states the rule,
none too strongly, as follows:  " The publication of a libel
is a wrongful act, presumably injurious to those persons
to whom it relates, and in the absence of legal excuse, gives a
right of recovery, irrespective of the intent of the defendant
who published it; and this although he had reason to believe
the statement to be true, and was actuated by an honest, or
even commendable, motive in making the publication."
Tending in the same direction is the holding by this court in
*Fountain v. West,* 23 Iowa, 9, where we sustained the ruling
of the trial court excluding testimony that the defendants
believed and had good reason for believing the plaintiff guilty
of the matters charged against him, and said:  " It would
be little less than holding out a bonus for the publication
of libelous writings to decide that the party publishing could
successfully take cover behind this belief.  The law is ten-
der of the reputation of the citizen.  It seeks to protect it.
It is no light matter to charge another with a crime and
publish it to the world.  He who does so in a way which
the law holds not privileged assumes the peril of proving it
to be true."

III.  It is reiterated several times in the appellee's
motion for a directed verdict that the plaintiff failed to offer
any proof of malice.  Omitting reference to the
question of privilege hereinafter considered, it
need only be said upon this point that, the publication being
libelous *per se,* malice is presumed, and no other proof need be
offered than the publication itself.  This is too elementary to
require a citation of the authorities, the gist of which is thus
condensed in the headnote to *Nichols v. White,* found in 3
How. 266 (11 L. Ed. 591):  " Every publication, either by
writing, printing, or pictures, which charges upon or imputes
to any person that which renders him liable to punishment, or
which is calculated to render him infamous or odious or
ridiculous, is *prima facie* a libel; and implies malice in the

6. MALICE.

author and publisher toward the person concerning whom such publication is made. Proof of malice in these cases cannot be required of the party complaining beyond the proof of the publication itself. Justification, excuse, or extenuation, if either can be shown, must proceed from the defendant." The term "malice," as employed in the definition of libel *per se* is often misunderstood by the general reader, and is sometimes misapprehended by lawyers. It does not necessarily mean personal hatred or ill will toward the person at whom the libel is directed. Legal malice in the publisher of a libel is not inconsistent with honesty of purpose and good motive. As we have already noted, good faith will not justify a publication which the law declares to be wrongful; and when a party does such wrongful act, the natural result of which is to injure another, the law characterizes it as malicious, without regard to the motive which prompted it. In other words, malice is the want of legal excuse for an act done to the injury of another. Whoever gives currency to libelous matter (not protected as being privileged) must be prepared to prove its truth, if he would avoid liability to the party injured.

IV. It may here be remarked that defendant's answer in the case before us does not tender a plea of the truth of
**7. Justification:** the alleged libel. It does, in the third count,
**pleadings.** allege the truth of certain specific statements, mainly, if not altogether, those made use of by the defendant in its printed comments accompanying the republication of the article from the Boone Republican. It nowhere attempts to justify or assert the truthfulness of all the injurious matters contained in the publication. To be available as a defense, the justification must be broad as the libel. *Skinner v. Grant,* 12 Vt. 456; *Kerr v. Force,* 3 Cranch, 8, Fed. Cas. No. 7,730; *Cook v. Tribune,* 5 Blatchf. 352, Fed. Cas. No. 3,165; *Jones v. Townsend,* (Fla.), 58 Am. Dec. 676; *Gault v. Babbitt,* 1 Ill. App. 130. This rule requires not only that the plea of truth must extend to the entire

language complained of, but must allege their truth in the sense imputed to them by the plaintiff. In his petition the plaintiff alleges that the publication was intended to impute to him the crime of embezzlement, and under the rule just stated, the defendant, to rely upon the plea of truth as a complete defense, is required to affirm the truth of such imputation. *Downey v. Dillon,* 52 Ind. 442; *Nelson v. Musgrave,* 10 Mo. 648; *Fidler v. Delavan,* 20 Wend. 57; *Loveland v. Hosmer,* 8 How. Prac. 215; *Kelly v. Waterbury,* 87 N. Y. 179; *Snow v. Witcher,* 31 N. C. 346; *Gage v. Robinson,* 12 Ohio, 250; *Ames v. Hazard,* 8 R. I. 143. This has not been done. It follows, of necessity, that the plaintiff was entitled to have his claim submitted to the jury, unless we further find that the alleged privileged character of the publication is clearly apparent from the record.

V. Matter which would ordinarily be clearly slanderous or libelous is sometimes published under circumstances which render it privileged, and no action will lie for the **8. PRIVILEGED PUBLICATIONS: malice.** recovery of damages. It is the claim of appellee that the alleged libel now under consideration comes within that category. In *White v. Nichols, supra,* the opinion by Daniel, J., which fairly reflects the law on this subject, classifies matter which is thus privileged as follows: "(1) When the author or publisher acts in the *bona fide* discharge of a public or private duty, legal or moral, or in the prosecution of his own rights or interests, for example, words spoken in confidence and friendship as a caution, or a letter written confidentially to persons who employed A as a solicitor conveying charges injurious to his professional character in the management of certain concerns which they had intrusted to him, and in which the writer of the letter was also interested. (2) Anything said or written by a master giving the character of a servant who has been in his employment. (3) Words used in the course of a legal or judicial proceeding, however hard they may bear upon the party of whom they are used. (4) Publica-

tions duly made in the ordinary mode of parliamentary proceedings; as a petition printed and delivered to the members of a committee of the House of Commons to hear and examine grievances." But the doctrine of privilege operates to change the ordinary rules with respect to libelous matter to this extent only: it removes the presumption of malice, and makes it incumbent on the party complaining to show malice. This may be done by the construction of the written matter constituting the alleged libel, or by extrinsic facts and circumstances from which the existence of malice may fairly be inferred. Under this rule, even were the court disposed to hold that the publication was *prima facie* privileged, the plaintiff was still entitled to have the judgment of the jury whether such publication was made in good faith or with malice. To quote from *Wright v. Woodgate,* 2 Cromp., M. & R. 573: "A privileged communication is a communication made on such an occasion as rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the onus of proving malice in fact, but not of proving it by extrinsic evidence only. He has still a right to require that the alleged libel itself shall be submitted to the jury, that they may judge whether there is evidence of malice on the face of it." This proposition is expressly affirmed as law in *Nichols v. Eaton,* 110 Iowa, 513.

But it is very manifest that the classification of cases above given in which privilege may be claimed for matter

9. PRIVILEGED PUBLICATIONS. otherwise libelous is not broad enough to include a publication such as we here have to deal with. Some effort is made in argument to bring it within the general scope of the duty which defendant owed to the public. This phase of the doctrine of privilege has been generally invoked in cases where the plaintiff holds or is a candidate for some position of public trust. Such has been the character of the cases in which this court has applied or considered the plea of public duty in defense of a charge

of libel.  *Mott v. Dawson,* 46 Iowa, 533; *State v. Haskins,* 109 Iowa, 656; *Bays v. Hunt,* 60 Iowa, 251.  The utmost extent to which these cases go is that where a person, knowing or honestly believing that a candidate for public office is guilty of conduct affecting his fitness for the position to which he aspires, communicates that knowledge or belief to the electors whose support the candidate seeks, acting in good faith in the discharge of his duty to the public, the communication is privileged — a doctrine the correctness of which we need not now consider.  But there is no moral or legal duty resting upon any person to publish to the world defamatory matter affecting the character or reputation of one whose only relation to the public is that of a private citizen in the pursuit of a lawful private business; and if one assumes the responsibility of proclaiming such matter from the housetops, or through the public print, the law affords him no defense except upon proof of the truth of the publication.  An insurance agent as such is not a public officer, not is his character a matter of general public interest, except as the public has an indirect interest in the private character and conduct of every member of society, but this interest is not sufficient to invoke the privilege of which we are speaking.  To hold otherwise would be to destroy at one sweep the effectiveness of all law against slander and libel.  Even the right to plead the truth of a libel is restricted by the constitutional provision herein cited to publications made " with good motives, and for justifiable ends."  If we understand the force of the answer sought to be interposed to the plaintiff's action, it is that defendant, being the publisher of a newspaper, is in duty bound to publish the news of the day for the benefit of its readers, and if, after due investigation, and in the exercise of reasonable care, and without actual malice, it publishes defamatory matter concerning a citizen, the person so injured is without remedy, such publication being privileged.  This proposition is without support in principle or precedent.  The publisher has

no right to publish in his paper matters or statements which he or any other citizen would not be justified in circulating by letter or by posting upon the blank walls of the city. Our Constitution guarantees to every person liberty " to speak, write, and publish his sentiments on all subjects," but holds him " responsible for the abuse of that right." Constitution of Iowa, article 1, section 7. " Liberty of the press " has never been held to mean " that the publisher of a newspaper shall be any less responsible than another person would be for publishing otherwise the same libelous matter." The contrary rule has been affirmed by the courts of this country and England with great uniformity. *Jones v. Townsend,* 21 Fla. 431 (58 Am. Rep. 676); *Sheckell v. Jackson,* 10 Cush. 25; *Aldrich v. P. P. Co.,* 9 Minn. 138 (Gil. 123, 83 Am. Dec. 84); *Root v. King,* 7 Cow. 628; *Tillson v. Robbins,* 68 Me. 295 (28 Am. Rep. 50); *Smart v. Blanchard,* 42 N. H. 137; *Foster v. Scripps,* 39 Mich. 376 (33 Am. Rep. 403); *Barr v. Moore,* 87 Pa. 385 (30 Am. Rep. 367); *Eviston v. Cramer,* 47 Wis. 659 (3 N. W. Rep. 392); *Edwards v. San J. Pr. Soc.,* 99 Cal. 431 (34 Pac. Rep. 128, 37 Am. St. Rep. 70); *McAllister v. F. Press,* 76 Mich. 338 (43 N. W. Rep. 431, 15 Am. St. Rep. 318); *Upton v. Hume,* 24 Ore. 420 (33 Pac. Rep. 810, 21 L. R. A. 493, 41 Am. St. Rep. 863); *Smith v. Tribune,* 4 Biss. 477, Fed. Cas. No. 13,118; *Davis v. Sladden,* 17 Ore. 259 (21 Pac. Rep. 140); *Barnes v. Campbell,* 59 N. H. 128 (47 Am. Rep. 183); *Davis v. Duncan,* 7 El. & Bl. 231; *Mallory v. P. P. Co.,* 34 Minn. 521 (26 N. W. Rep. 904); *Delaware, etc., Ins. Co. v. Crosdale,* 6 Houst. 181; *Palmer v. Concord,* 48 N. H. 216 (97 Am. Dec. 605). See, also, exhaustive note by *Mr. Freeman,* 15 Am. St. Rep. 343. The tendency of all the authorities is indicated in the following excerpts from some of the cases above cited: " The publisher of a newspaper possesses no immunity from liability on account of a libelous publication, not belonging to any other citizen." Bean, J., in *Upton v. Hume.* " The press does not possess

any immunities not shared by every individual," Flandreau, J., in *Aldrich v. P. P. Co.* "The liberty of the press is not more under the protection of the Constitution than the liberty of speech, and the publisher of a newspaper can only defend an action for libel, or mitigate the damages to be recovered therefor, upon precisely the same grounds as any other individual could defend an action for slander in uttering the same words on the street." De Haven, J., in *Edwards v. San J. Pr. Soc.* Further citation of authorities is unnecessary. None have been called to our attention holding to the doctrine contended for in support of the ruling appealed from.

VI. In further support of the ruling appealed from it is said there was no evidence of special damages sustained by the plaintiff. Were this a correct view of the record, it would be sufficient to suggest once more that, the publication being libelous *per se,* damage is presumed without other evidence thereof, and the plaintiff had the right to have the jury assess the amount. But the evidence does tend to show special damages. The general agent under whom plaintiff was employed at the time of the publication expressly testifies that the alleged libel had the effect to destroy the plaintiff's usefulness in the company's employment, and he therefore discharged him. With such evidence in the record, it cannot well be said that there was nothing for the jury to consider.

10. DAMAGES.

In this connection we may also say that the rulings of the trial court unduly restricted the plaintiff in his proof of special damages. For instance, plaintiff offered and attempted to prove what the income from his business had been up to the time of the alleged libel, and how it had fallen off immediately thereafter. This and other similar testimony was excluded upon the objection of the defendant. It should have been admitted. It is not possible, of course, to determine with absolute accuracy how much, if at all, the decrease, if any, in plaintiff's business,

11. SAME.

was attributable to the publication complained of, but the plaintiff was entitled to have the facts go to the jury for what they were worth. The point has been frequently considered by the courts, and the rule, as we state it, approved. *Whittemore v. Weiss,* 33 Mich. 348; *Noeninger v. Vogt,* 88 Mo. 589; *Bergmann v. Jones,* 94 N. Y. 51; *Daniel v. News,* 67 Hun, 649 (21 N. Y. Supp. 862), same case (142 N. Y. 660, 37 N. E. Rep. 569); *Law v. Scott,* 5 Har. & J. 438; *Moore v. Stevenson,* 27 Conn. 14; *Steketee v. Kimm,* 48 Mich. 322 (12 N. W. Rep. 177); *Evans v. Harries,* 1 H. & N. 254; *Ingram v. Lawson,* 8 Scott, 471.

Other questions argued are not likely to arise on a retrial, and we do not attempt to consider them. In closing this discussion it is proper for us to say that the argument for the appellant is in several instances rendered objectionable by offensive personal references to counsel for the appellee and to the editor of the newspaper in which the publication complained of was made. It is not to the discredit of a lawyer that he champions the cause of his client with zeal and earnestness, and hard words spoken in the heat of trial are easily overlooked and forgotten. But when counsel, in the seclusion of his office, prepares a formal brief to become a part of the permanent records of this court, due regard to the ethics of the profession and respect for the court dictate the rigid exclusion of all unkind and disparaging personal references not legitimately required for the proper presentation of the case.

For the reasons hereinbefore stated, a new trial must be ordered, and the judgment of the district court is REVERSED.